UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| BRUCE HOGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:07-CV-145 |
| | ) | |
| METAL PLATE POLISHING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

**I.  INTRODUCTION**

Plaintiff Bruce Hogan, who is African-American and was 49 years old at the time he was fired, brings this suit against his former employer, Defendant Metal Plate Polishing, Inc. ("MPP").  He asserts that it discriminated against him on the basis of his race and age, and then retaliated against him, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2; 42 U.S.C. § 1981; and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.[1] (Docket # 1.)

MPP moves for summary judgment on all claims, and the matter is now fully briefed. (Docket # 23-26.)  For the following reasons, MPP's motion for summary judgment will be DENIED.

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

## II.  FACTUAL BACKGROUND[2]

MPP, a company engaged in the business of electro plating and polishing of metals for the trucking industry, hired Hogan to work as a "polisher" in September 1997. (McCall Aff. ¶ 5; Hogan Dep. 7.)  Hogan's immediate supervisor, Greg Vinson, a black male over 50 years old, described Hogan's work performance prior to June 2006 by stating that "[Hogan] was good at – he was actually excellent at what he did."[3] (Vinson Dep. 20.)  Vinson elaborated that "as far as his work wise, there was no question about he was one of the best.  We used him to train . . . no question about his . . . . capability or his performance."[4] (Vinson Dep. 33.)

Despite his significant tenure of outstanding performance, Hogan was terminated by MPP on August 1, 2006, following a rapid sequence of disciplinary actions that commenced shortly after he lodged a complaint of racial discrimination with MPP. (Pl.'s Br. in Resp. to Def.'s Mot. for Summ. J. ("Resp. Br.") Exs. F-J; Def.'s Br. in Supp. of Its Mot. for Summ. J. ("Def. Br.") Exs. 4-7.)  It is to these events that we now turn in greater detail.

On June 28, 2006, Hogan complained in writing to MPP's director of human resources, Tom Maddux, of "retaliation, harassment, threats and intimidation."[5] (Hogan Aff. ¶ 5, Ex. 2.)  A

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Hogan, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Insofar as Hogan does not controvert the facts asserted by MPP in its "Statement of Material Facts," those facts "are admitted to exist without controversy" as set forth below. *See* N.D. Ind. R. 56.1.

[3] Due to his outstanding performance as a polisher, MPP states that it retained Hogan despite the fact that at one point in his employment, he purportedly used marijuana onsite and attended classes during work hours without authorization. (McCall Aff. ¶¶ 7, 8, 11.)

[4] In fact, MPP states that it paid Hogan a premium wage because he was a trainer. (McCall Aff. ¶ 13.)

[5] This was not Hogan's first complaint of racial discrimination to MPP.  On September 22, 2005, Hogan complained to Maddux that his supervisor at the time, Lee Biddle, harassed him because of his race in violation of Title VII. (Hogan Aff. 4, Ex. 1.)  After an investigation, Maddux determined there was no discrimination but that Biddle "inoffensively tapped Hogan on the shoulder to get his attention and spoke to him loudly because the shop is

meeting of the polishing department led by Vinson earlier that day prompted his complaint. (Hogan Aff. ¶ 5, Ex. 2.)  At the meeting, Vinson discussed certain quality issues related to third shift polishers, stating that "[s]hit runs downhill" and "[t]hey want me to fire someone."[6] (Hogan Dep. 15-17.)  Vinson then singled Hogan out to go to third shift to help alleviate the problem, stating that another polisher, Robert Casteel (a white male of similar age to Hogan), was a "possibility" for transfer. (Vinson Dep. 21; Hogan Dep. 17; Resp. Br. Ex. M; Def.'s Supplemental Answers to Pl.'s First Set of Interrogs. No. 11.)  Hogan, however, objected to the transfer to third shift, explaining to Vinson that he was having family problems.[7] (Vinson Dep. 21.)  After the meeting, Hogan complained in writing to Maddux that he was "being singled out, harassed and threatened in retaliation for filing a Title VII complaint with this office in August of 2005."[8] (Hogan. Aff. Ex. 2.)  Maddux reviewed the situation and posted a memo to all employees explaining that the meeting was simply to make a business point and was not directed at any one employee. (Def. Br. Ex. 3.)

On July 11, 2006, less than two weeks after Hogan lodged his complaint of discrimination, Vinson posted a memo to "All Polishers" addressing "Polishing Standards." (Def.

---

so loud." (Maddux Aff. ¶ 6.)  Nonetheless, MPP's President Jim McCall determined that "Hogan should have no further reporting relationship with Biddle to prevent any future misunderstandings." (Maddux Aff. ¶ 6.)

[6] Vinson describes this meeting a bit differently, explaining that he convened it with his "top, best guys" who were capable of training other employees because he was having problems with new employees on another shift failing to properly run certain parts. (Vinson Dep. 20.)  Vinson explained that he "wanted . . . one of the other guys that was more proficient in running to go on another shift and help train the guys." (Vinson Dep. 20.)

[7] Vinson represents that the transfer to third shift "wasn't a mandatory thing" but that he was seeking volunteers. (Vinson Dep. 20-21.)  Hogan never did transfer to third shift, as he worked the day shift up until his termination. (Hogan Dep. 18.)

[8] Yet, when asked at his deposition why he thought MPP would have picked him to train less experienced employees, Hogan stated that it was because the quality of his work was "outstanding." (Hogan Dep. 34-35.)

Br. Ex. 2.)  The memo set forth specific standards as to the number of parts per machine that an operator should complete in an eight-hour shift. (Def. Br. Ex. 2.)  The memo stated that the standards would serve as the basis for raises and that if they were "not met on a consistent basis then an employee will be reprimanded for not reaching the standard."[9] (Def. Br. Ex. 2.)

At 9:00 a.m. the next morning, Vinson stopped Hogan's coworker from running certain parts that were being fed to Hogan, causing Hogan to "run out of pipe" on the auto buff machine that he was operating. (Hogan Dep. 35-37 ("I run out of pipe, because there ain't nothing coming to me.").)  As a result, Hogan completed only 56 pipes in an eight-hour shift on the auto buffer when the standard called for 135 to 175. (Def. Br. Ex. 4; Resp. Br. Ex. F.)  Vinson then issued Hogan a written warning for "failure to follow instructions" and "substandard work," citing him for failing to meet the required production standard for the shift. (Def. Br. Ex. 4; Resp. Br. Ex. F.)

Several days later, that is, on July 17, 2006, Vinson moved Hogan to a machine called the "Garboli." (Resp. Br. Ex. G.)  On his first day on the Garboli, Hogan ran out of pipe twice during his shift because "they didn't have any pipe coming to that machine" and the machine lost power at times. (Def. Br. Ex. 5; Resp. Br. Ex. G; Hogan Dep. 23-24.)  In fact, Hogan ran some pipe a second time "just to stay busy, so [he] just wouldn't be standing around." (Hogan Dep. 23-24.)  Hogan produced 24 parts that shift, falling significantly short of the 100-plus standard for the Garboli. (Def. Br. Exs. 2, 5; Resp. Br. Ex. G.)  On his second day on the Garboli, a breaker tripped and the machine was without power for three to four hours, resulting in Hogan producing just 13 parts during his shift. (Def. Br. Ex. 5; Resp. Br. Ex. G; Hogan Dep. 23-25; Vinson Dep.

---

[9] Vinson states, and Hogan does not dispute, that MPP created these standards by performing timed tests of several employees, including Hogan; nonetheless, Hogan refers to the standards, at least at one point in the record, as a "rate increase." (Vinson Dep. 27; Resp. Br. Ex. F.)

48-49.)  As a result of Hogan's performance on the Garboli on July 17 and 18, Maddux issued Hogan a three-day suspension for "substandard work," noting on the disciplinary report that Hogan's "[n]umbers are not where they should or are suppose[d] to be."[10] (Def. Br. Ex. 5; Resp. Br. Ex. G.)

Hogan was perplexed by the discipline that he received, asserting that he was not adequately trained for the Garboli and was left to run it unsupervised.[11] (Resp. Br. Ex. G.)  Indeed, Vinson admits that he did not necessarily agree with Maddux's decision to discipline Hogan on July 17 and 18, conceding that "normally if a guy . . . [has] been off a machine for a while, it takes you, you know, [time] to get back in the groove, and . . . this was his first day back on there, and maybe that's why he had a bad day. . . ." (Vinson Dep. 48.)  In fact, Vinson confided that MPP's application of its disciplinary policy was not always consistent, stating "[a] lot of times . . . we didn't follow the guideline[s], you know?" (Vinson Dep. 11.)

Upon Hogan's return to work from the suspension, Vinson transferred him to yet another machine, this time the "wheel," without additional training, evaluation, or supervision. (Resp. Br. Ex. H.)  On July 24 and 25, Hogan ran 38 parts one day and 47 parts the other.[12] (Def. Br. Ex. 6; Resp. Br. Ex. H.)  About 9:00 a.m. on July 26, before Hogan produced any parts for that shift, Maddux suspended Hogan for three more days, citing "substandard work" and that his "numbers

---

[10] Curiously, though the disciplinary report was for Hogan's alleged substandard performance on both July 17 *and* 18, Vinson's signature on the form is dated July 17 – that is, *before* Hogan even began his workday on July 18. (Def. Br. Ex. 5.)

[11] MPP states that Hogan was indeed trained on the Garboli, though it cannot say exactly when that took place. (Vinson Dep. 27, 51.)

[12] The record is unclear as to what MPP's production standard is for the "wheel." (*See* Def. Br. Ex. 2.)

5

[were] not up to the standard rate."[13] (Def. Br. Ex. 6; Resp. Br. Ex. H; Hogan Dep. 28; Hogan Aff. ¶ 6.)  More pointedly, MPP's position is that Hogan "st[ood] around for the entirety of his shift instead of working" (McCall Aff. ¶ 12), and "just didn't do anything" (Vinson Dep. 51, 54).  That same day, Vinson wrote up Hogan a second time – this time for leaving on his three-day suspension without completing a daily time ticket. (Def. Br. Ex. 6.)

Hogan returned to work on August 1, 2006, following his suspension. (Resp. Br. Ex. J.) Early into his shift, Vinson asked Hogan if he had a problem, but Hogan stated that he "didn't have anything to say." (Hogan Dep. 29.)  Vinson then sent Hogan to see Maddux, who asked him if there was anything he could do to help him; Hogan again simply responded: "I don't have anything to say." (Hogan Dep. 30-31.)  MPP then terminated Hogan two hours into his shift, writing the following on his final disciplinary report: "Employee has been given ample time to bring his numbers up and is unwilling to cooperate.  So we have no other option but to terminate his employment.  Employee stood around and did nothing on 7-27-06 and has not done anything 8-1-06." (Def. Br. Ex. 7; Resp. Br. Ex. J.)  Of course, MPP was incorrect in its statement that Hogan "stood around and did nothing on July 27," as Hogan was on his three-day suspension on July 27 and thus was not at work. (Resp. Br. Ex. J; Hogan Aff. ¶ 7.)

MPP states that Vinson, Maddux, and McCall were the decision makers with respect to Hogan's termination.[14] (Reply Br. 2.)  Vinson volunteered that "the reason why there is so many

---

[13] The record does not indicate whether Hogan's suspensions were paid or unpaid.

[14] In response to an interrogatory inquiring about who was involved in the decision to terminate Hogan's employment, Maddux answered: "Supervisors Vinson, Biddle and Maddux met and conferred on August 1, 2006, and determined to terminate the Plaintiff on or about that date.  Maddux reviewed the decision to terminate with McCall, who ultimately sanctioned the decision of his subordinates." (Def.'s Answers to Pl.'s First Interrogs. No. 10.)  Biddle, however, denied any involvement in the decision to terminate Hogan and stated that Maddux's answer to the interrogatory was incorrect. (Biddle Aff. 16.)  Indeed, in its reply brief, MPP represents that Vinson, Maddux, and McCall were the decision makers, not Biddle. (Def.'s Reply Br. in Supp. of Mot. for Summ. J. ("Reply Br.") 2.)

6

write-ups . . . [is that] we wanted to be careful and make sure that we had enough writeups and everything to cover ourselves." (Vinson Dep. 54-55.)  After Hogan's termination, ten incumbent employees rotated into operating the auto sander/buffer, which was Hogan's designated machine. (Def.'s Answers to Pl.'s First Interrogs. No. 11.)  MPP states that seven of these ten employees were black, and seven of the ten employees were over the age of forty. (Def. Br. 10-11 (citing Def.'s Answers to Pl.'s First Interrogs. No. 11); Def.'s Supplemental Answers to Pl.'s First Set of Interrogs. No. 11.)

On August 4, 2006, Hogan filed a charge of discrimination on the basis of race, age, and retaliation with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a right to sue letter on March 20, 2007. (Def. Br. Ex. 8; Hogan Dep. 31.)  On June 21, 2007, he filed the instant action in this Court. (Docket # 1.)  When asked at his deposition why he thought his termination was motivated in part by his age, Hogan stated:

> Many times in the past we would have open meetings in the polishing department, with Greg [Vinson], sometimes Lee Biddle would be there, but most of the time Greg.  In these meetings, many times we were told that the older workers wouldn't be fired, they would just be reduced in pay until they quit.  And this wasn't a secret.  This was something that took place in meetings, with statements like this being made.  How else am I supposed to take it?

(Hogan Dep. 39.)

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material

7

dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

### A. Hogan's Retaliation Claim

Although MPP moved for summary judgment on "all claims" (Def.'s Mot. for Summ. J. 1), MPP never advances an argument with respect to Hogan's retaliation claim in its motion for summary judgment. In fact, the only mention by MPP of Hogan's retaliation claim is MPP's cursory suggestion in its reply brief that retaliation was "not an allegation in [Hogan's] Complaint . . . ." (Reply Br. 2.)

Admittedly, Hogan did not set forth a retaliation claim under a separate heading in his Complaint. Yet, contrary to MPP's suggestion, Hogan did indeed expressly advance the theory of retaliation in his pleading under the heading "Claim I - Violation of Title VII . . ." by stating: "On information and belief, Metal Plate retaliated against Plaintiff for complaining to management that he believed he was being singled out because of his race. The retaliation took the form of harassment, threats, shift changes, machine changes and ultimately termination." (Compl. ¶ 31; *see also* Compl ¶¶ 12, 13.) Moreover, in the first section of his Complaint, Hogan articulates:

8

"This is an action to redress Defendant Metal Plate's discrimination *and retaliation* against Plaintiff Hogan because of his race in violation of Title VII . . . and 42 U.S.C. § 1981 . . . ."[15] (Compl. ¶ 1 (emphasis added).)

"[G]eneral allegations about retaliation for complaints about race discrimination . . . suffice at the notice pleading stage." *Stimeling v. Bd. of Educ.*, No. 07-1330, 2008 WL 2876528, at *3 (C.D. Ill. July 24, 2008) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1085 (7th Cir. 2008)). The Court believes that the Complaint provides adequate information for MPP to "begin to investigate and defend against [Hogan's Title VII retaliation] claim."[16] *Tamayo*, 526 F.3d at 1085 ("[T]he complaint merely needs to give the defendant sufficient notice to enable him to begin to investigate and prepare a defense.").

In any event, "[i]t is well settled that issues raised for the first time in a reply brief are deemed waived[,]" *Nelson v. La Crosse County Dist. Attorney (State of Wis.)*, 301 F.3d 820, 836 (7th Cir. 2002), as well as "[p]erfunctory or undeveloped arguments," *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). *See also Freeman United Coal Mining Co. v. Office of Workers' Comp. Programs, Benefits Review Bd.*, 957 F.2d 302, 305 (7th Cir. 1992) (emphasizing that the court has "no obligation to consider an issue that is merely raised, but not developed, in a party's brief"). As a result, MPP's motion for summary judgment with respect to Hogan's Title

---

[15] Furthermore, Hogan checked the "retaliation" box on his EEOC charge. (Def. Br. Ex. 8.)

[16] Hogan, however, did not advance a retaliation claim under the ADEA in his Complaint. Nor does the record reflect that he even complained to MPP about age discrimination prior to his termination. *See* 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful *by this section*, or because such individual . . . has made a charge . . . *under this chapter*." (emphasis added)). In fact, Hogan's two complaints to Maddux about discrimination expressly reference Title VII, *not* the ADEA. (Resp. Br. Exs. L, M.) Therefore, any purported claim of retaliation under the ADEA by Hogan merits no further mention. *See Schulz v. Varian Med. Sys., Inc.*, 315 F. Supp. 2d 923, 937 (N.D. Ill. 2004) (denying retaliation claim under the ADEA where plaintiff complained about gender discrimination but "never told anyone that he thought he was being treated differently because of his age").

VII retaliation will be denied.

### B. Hogan's Discrimination Claims

1. <u>Discrimination Claims Under Title VII and the ADEA</u>[17]

A plaintiff alleging employment discrimination under Title VII or the ADEA can contest summary judgment by using either the direct or indirect method of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008); *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). The direct method requires the plaintiff to produce enough evidence, either direct or circumstantial, "that could permit a reasonable jury to conclude that the employer acted with discriminatory intent . . . ." *Brewer*, 479 F.3d at 915; *see also Atanus*, 520 F.3d at 671-72 ("The focus of the direct method of proof . . . is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action."); *Cerutti v. BASF Corp*, 349 F.3d 1055, 1061 (7th Cir. 2003).

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework, as modified in the context of a mini-reduction-in-force ("mini-RIF"), that is where the plaintiff's duties were absorbed by other employees. *See, e.g.*, *Petts v. Rocklege Furniture LLC,* __ F.3d __, 2008 WL 2791674, at *8 (7th Cir. July 21, 2008); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 492 (7th Cir. 2007). Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. In order to establish a prima facie case of

---

[17] The Seventh Circuit Court of Appeals generally has applied the same prima facie requirements to discrimination claims brought under Title VII and § 1981. *Humphries v. CBOCS West, Inc*., 474 F.3d 387, 403 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1951 (2008); *Herron v. DaimlerChrysler Corp*., 388 F.3d 293, 299 (7th Cir. 2004) (stating that § 1981 claims are evaluated under the same rubric as Title VII claims). Moreover, the "at-will nature (i.e., no formal written contract and no specific terms of employment) of [a plaintiff's] employment . . . does not preclude [him] from relying on section 1981's provisions pertaining to contracts." *Humphries*, 474 F.3d. at 398 n.7. Consequently, we will consider Hogan's § 1981 discrimination claim in tandem with his Title VII claim, referring for ease solely to his Title VII claim in this Opinion.

10

discrimination under Title VII or the ADEA in a mini-RIF situation, the plaintiff must show that 1) he belongs to a protected class, 2) he performed his job according to his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) "[his] job duties were absorbed by employees who were not members of [his] protected class." *Hemsworth*, 476 F.3d at 492.  If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802.  Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *Id.* at 804.

       2. Analysis

Here, Hogan argues his claims of racial and age discrimination solely under the indirect method of proof, that is, the *McDonnell Douglas* framework, foregoing any argument under the direct method. (*See* Resp. Br. 11.)  For purposes of summary judgment, MPP concedes that Hogan can establish the first and third elements of his prima facie case (Def. Br. 10); it contends, however, that Hogan's claims falter on the remaining two elements and in proving that its proffered reason for his termination was pretextual.

       *a. The Prima Facie Case*

MPP first argues that because Hogan was not performing satisfactorily at the time of his termination, he cannot meet the second prima facie case element.  On that point, the Court is faced with the classic situation wherein an employer's alleged non-discriminatory reason for terminating the plaintiff is that the employee's performance did not meet the employer's expectations.  In cases where this occurs, the legitimate expectations prong of the prima facie case often merges with the related issue of pretext. *See Roberts v. Separators, Inc.*, 172 F.3d 448, 451

(7th Cir. 1999) (instructing that the analysis of an employer's legitimate expectations often "dovetails" with that of pretext). Therefore, instead of weighing the evidence in the context of the prima facie case, we will consider it in deciding whether MPP can establish a legitimate, nondiscriminatory reason for Hogan's firing. *Id*.; *see also Plair v. E.J. Brach & Sons*, 105 F.3d 343, 347 (7th Cir.1997). Accordingly, we move on to the fourth prong of the *McDonnell Douglas* burden shifting test – the similarly situated requirement.

On that score, in a mini-RIF context Hogan bears the burden of demonstrating that his duties were absorbed by employees outside of the protected class. *See, e.g.*, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000). Admittedly, Hogan's showing in this respect is not particularly persuasive, since seven out of the ten incumbent employees who absorbed his duties were black, and seven out of the ten employees were over the age of forty. *Young v. Ill. Dept. of Revenue*, No. 06-3106, 2008 WL 162120, at *4 (C.D. Ill. Jan. 16, 2008) (stating that in a mini-RIF framework, a plaintiff must show that his duties were absorbed "mainly" by employees outside of the protected class); *Anderson v. GSF Mortgage Corp.*, 543 F. Supp. 2d 869, 874 (N.D. Ill. 2008) (stating that in a mini-RIF a plaintiff need demonstrate only that "a majority" of the employees who assumed her duties were not members of the protected class).

Nonetheless, the parties do not dispute that at least *some* of Hogan's duties were indeed absorbed by individuals outside of his protected class. *See Williams v. United Tech. Carrier Corp.*, 310 F. Supp. 2d 1002, 1013 (S.D. Ind. 2004) (finding that a plaintiff satisfied the fourth prong of his prima facie case in a mini-RIF context where "at least some of [the plaintiff's] duties were absorbed by non-African-American employees"). Moreover, the Seventh Circuit Court of Appeals has stated that "[t]he retention of an employee outside the protected class to perform the

plaintiff's duties is nothing more than a demonstration of more favorable treatment, particularly tailored to the factual circumstances of a mini-RIF case." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690 n.1 (7th Cir. 2006). In that vein, several cases have held that "a mini-RIF plaintiff, who is unable to show that the individuals who assumed his duties were outside of the protected class, has the option of demonstrating [his] prima facie case under the traditional – and more rigorous – *McDonnell Douglas* analysis; that is, [he] may survive summary judgment by showing that similarly-situated individuals outside of the protected class fared better. *See, e.g.*, *Anderson*, 543 F. Supp. 2d at 874; *Young*, 2008 WL 162120, at *4 (citing *Wichmann v. Bd. of Trs. of S. Ill. Univ.*, 180 F.3d 791, 802 (7th Cir. 1999), *vacated and remanded on other grounds*, 528 U.S. 1111 (2000); *Merillat*, 470 F.3d at 690 n.1).

"Ultimately, calling an adverse employment action a 'mini-RIF' merely emphasizes that *McDonnell Douglas*, rather than the RIF test, should apply." *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). In fact, here MPP does not necessarily characterize its termination of Hogan as a RIF, but rather quite the opposite – a termination for cause.[18] *See, e.g., Hentea v. Trs. of Purdue Univ.*, No. 2:04-CV-526, 2006 WL 1207911, at *9 (N.D. Ind. May 1, 2006); *Vonckx v. Allstate Ins. Co.*, No. 02 C 8474, 2004 WL 1427105, at *9-10 (N.D. Ill. June 23, 2004). Therefore, in order to give Hogan every reasonable inference, we will also examine the fourth prong of his prima facie case under the traditional *McDonnell Douglas* approach.

To make a showing that two or more employees are similarly situated under the traditional *McDonnell Douglas* methodology, a plaintiff must show that he is similarly situated with respect

---

[18] On that front, MPP set forth the mini-RIF legal standard in its supporting memorandum, but articulated the traditional *McDonnell Douglas* methodology in its reply brief. (*Compare* Def. Br. 9, *with* Reply Br. 6.)

to "performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000); *see also Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 688 (7th Cir. 2007). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617; *see also Peirick*, 510 F.3d at 688.

To satisfy the similarly situated requirement with respect to racial discrimination, Hogan points to Robert Casteel, a white male polisher who was one of the ten employees who absorbed Hogan's tasks. Significantly, Casteel has a history of twelve disciplinary actions, including four infractions in 2006, several of which, like Hogan, were for "lack of cooperation" and "substandard work." (Def.'s Supplemental Answers to Pl.'s First Set of Interrogs. No. 11.) In fact, three of Casteel's disciplinary actions occurred within a four-month period in 2006 (Def.'s Supplemental Answers to Pl.'s First Set of Interrogs. No. 11); yet, in contrast to Hogan, he was not terminated. Considering this disciplinary history and that he, like Hogan, is a polisher managed by Vinson, we easily conclude that Casteel is sufficiently similarly situated to satisfy the fourth prong of Hogan's prima facie case of racial discrimination.

For purposes of his age discrimination claim, Hogan identifies Jesus Guardjo and Juan Donis, who were both 21 years old at the time Hogan was terminated.[19] (Def.'s Supplemental Answers to Pl.'s First Set of Interrogs. No. 11.) They too were among the ten incumbent

---

[19] In order to prevail on an ADEA claim, the plaintiff must demonstrate that the similarly situated employee was "substantially younger" than the plaintiff. *Jordan v. City of Gary*, 396 F.3d 825, 835 (7th Cir. 2005). Here, there is no question that Guardjo and Donis were "substantially younger" than Hogan, who was age 49 at the time he was terminated. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321-22 (7th Cir. 2003) ("The Seventh Circuit has defined 'substantially younger' as generally ten years younger.").

14

polishers who were managed by Vinson and absorbed Hogan's duties. (Def.'s Supplemental Answers to Pl.'s First Set of Interrogs. No. 11.) Though they were relatively new employees and thus had no disciplinary history at the time Hogan was terminated, Guardjo received three disciplinary infractions in the year following Hogan's termination yet still remained employed by MPP. (*See* Def.'s Supplemental Answers to Pl.'s First Set of Interrogs. No. 11.)

On that score, the "similarly situated requirement should not be applied mechanically or inflexibly." *Peirick*, 510 F.3d at 688 (quotation marks and citation omitted). "It is important not to lose sight of the common-sense aspect of this inquiry. It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees – distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions." *Humphries*, 474 F.3d at 405. "[T]he fundamental issue remains whether such distinctions are so significant that they render the comparison effectively useless." *Id*.

Moreover, in response to Hogan's interrogatory requesting all of the daily time sheets for polishers between January 1, 2002, and August 1, 2006, MPP produced only eleven time sheets, five of which were Hogan's. (Def.'s Resp. to Pl.'s First Reqs. for Produc. of Docs. No. 21.) Therefore, on this record we are unable to more particularly compare Hogan's production performance to that of other polishers, including Casteel, Donis, or Guardjo, during the relevant time period, that is, after the standards were published on July 11, 2006, up until Hogan's termination on August 1, 2006.

Considering all of the foregoing, we think that the distinction between Hogan and Guardjo's disciplinary history is not so significant that it renders the comparison useless, *Humphries*, 474 F.3d at 405, particularly in this context where the legitimacy of Hogan's

15

discipline is at issue.  As a result, we conclude that Hogan has also adequately satisfied the fourth prong of his prima facie case of age discrimination, and thus we will proceed to the pretext inquiry.

> ### b. *Pretext*

The focus for a pretext inquiry is "whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."). Simply put, pretext is "a deliberate falsehood." *Forrester*, 453 F.3d at 419.

"Pretext may be established directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999) (citation omitted); *see also Forrester*, 453 F.3d at 417-18; *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 548 (7th Cir. 2002).  Ultimately, the plaintiff proceeding indirectly must also "provide evidence of at least an inference that the real reason for their dismissal was discriminatory." *Jackson*, 176 F.3d at 983; *see also Brown v. Ill. Dept. of Natural Res.*, 499 F.3d 675, 683 (7th Cir. 2007).

However, "at summary judgment the plaintiff is not required to establish pretext *and* provide evidence of a discriminatory motive by the defendant . . . .  This level of proof is only

16

required when a plaintiff's case is submitted to a finder of fact." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005).  Rather, in order to survive a motion for summary judgment, the plaintiff "need only produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [his] dismissal." *Id.* (quotation marks and citation omitted); *see also Forrester*, 453 F.3d at 417; *Alexander v. Wis. Dept. of Health & Family Servs.*, 263 F.3d 673, 682-83 (7th Cir. 2001); *Jackson*, 176 F.3d at 984.

     As is by now evident from the record, there is a substantial factual dispute between Hogan and MPP as to whether MPP's expectations were "legitimate" and whether it applied discipline in a discriminatory manner.  Though Hogan does not necessarily take issue with the quantitative standards that MPP set for each machine under normal circumstances, he does create a dispute of fact as to whether those expectations were legitimate under the circumstances he faced between July 11, 2006, and August 1, 2006.  Those circumstances, at least as Hogan describes them, include close monitoring of his production output in comparison with the standards, an inadequate amount of material to run at times, and frequent transfers by Vinson among different machines without sufficient explanation, additional training, or supervision. (*See, e.g.*, Hogan Dep. 33-38.)

     Indeed, a reasonable jury could conclude that these circumstances were engineered by Vinson and Maddux with the intent of setting up Hogan for termination.  "[B]ecause employment discrimination cases often turn on questions of intent and credibility, courts in these cases must take care as they weigh summary judgment motions not to invade the province of the factfinder by attempting to resolve swearing contests and the like." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997); *see also Tuszkiewicz v. Allen-Bradley Co., Inc.*, 967 F. Supp. 1119, 1127 (E.D. Wis. 1997) ("The court must . . . be careful not to step in the

shoes of the factfinder by resolving swearing matches.").

We take particular note of Vinson's purported admission that "[a] lot of times" MPP "didn't follow the [disciplinary] guideline[s]," as well as his statement that they "wanted to be careful and make sure that [they] had enough write-ups and everything to cover [them]selves." (Vinson Dep. 11, 54-55.)  Also notable is MPP's inability to produce the daily time sheets for other polishers during the relevant time period, suggesting perhaps that Hogan was singled out for heightened scrutiny at the time.  Moreover, Hogan's testimony that MPP employees were told "[m]any times" by Vinson or Biddle during meetings that "older workers wouldn't be fired, they would just be reduced in pay until they quit" may be particularly probative with respect to his age discrimination claim. (Hogan Dep. 39.)

Overall, when viewing the facts and drawing all inferences in the light most favorable to Hogan, a reasonable jury could conclude that MPP's proffered reason for terminating Hogan was a fabrication. *See generally Bombard v. Fort Wayne Newspapers, Inc*., 92 F.3d 560, 562 (7th Cir. 1996) ("In reaching a conclusion as to the presence of a genuine issue of material fact, we must view the evidence and draw all inferences in a way most favorable to the nonmoving party."). Of course, "[r]aising an inference of discrimination does not mean a plaintiff has won the case, but rather, only that a plaintiff has merely produced enough evidence to defeat summary judgment and proceed to trial." *Jackson*, 176 F.3d at 984 (quotation marks and citation omitted); *see also Rudin*, 420 F.3d at 726 ("[O]nce the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury – not the court." (quotation marks and citation omitted)).

Consequently, MPP's motion for summary judgment with respect to Hogan's claims of

racial and age discrimination will be denied.[20]

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Docket # 23) is DENIED.  Therefore, Plaintiff's racial discrimination and retaliation claims under Title VII and § 1981, and his age discrimination claim under the ADEA, survive.[21]

SO ORDERED.

Enter for August 4, 2008.

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge

---

[20] None of this discussion is intended to ignore MPP's assertion (and the evidence) that towards the end, Hogan merely stood by his machine and essentially did nothing, practically inviting a termination.  Of course, if the jury finds that this was in fact the true reason for Hogan's termination, a matter Hogan seems to contest, then MPP will prevail at trial.  At present, however, we must give Hogan every reasonable inference, and doing so results in denial of the present motion.  Of course, the viability of these claims can be considered anew under Federal Rule of Civil Procedure 50(a) at trial.

[21] Hogan contends in his response brief that MPP should be sanctioned for its failure to preserve evidence, that is, the daily time sheets of Hogan's coworkers. (Resp. Br. 24-25.)  Hogan's request fails to comply with Local Rule 7.1, which states that "[e]ach motion shall be separate . . . ." N.D. Ind. L.R. 7.1(b).  Therefore, Hogan's request for sanctions is DENIED; he may, however, file a separate motion seeking sanctions if he so desires.